IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

---

## FEBRUARY TERM, 1879.

---

PRESENT—HIRAM WARNER....... ...CHIEF JUSTICE.
L. E. BLECKLEY.:..........ASSOCIATE "
JAMES JACKSON........... " "

---

EARLY & LANE *et al. vs.* OLIVER & NORTON *et al.*

| 63 | 11 |
|----|-----|
| 94 | 532 |

1. Hearsay as to transactions indicative of fraud, is not admissible evidence, by affidavit or otherwise, on the hearing of an application for injunction and receiver. Matter that would be rejected at the main trial should have no influence on a preliminary examination.
2. Where, upon the facts in the record, the result of an interlocutory proceeding before the chancellor is unobjectionable, his refusal to hold another sitting to give opportunity for further argument is no cause for ordering a re-hearing, though there was inequality in the time for argument which the counsel for the respective parties enjoyed, Sunday having intervened whilst the counsel in conclusion was speaking, and when his intended address was but partially delivered.
3. A judge from another circuit, who, upon an interlocutory proceeding at chambers, in the county where the main cause is pending, has legally presided, may reserve his decision until after his return home, and may there mature it, reduce it to writing, and transmit it from thence to the proper clerk for record. He need not remain

2

in the circuit in which the hearing was had, nor return to it, for the mere purpose of making up and promulgating his judgment.

4. Though on the facts and circumstances which the bill, answer, affidavits, books, letters and other documents bring into view, a probable case be made of fraud in the purchase of goods from the complainants by their customer, and in the appropriation of the same to the sole benefit of one favored creditor, first as security to him by mortgage, and ultimately as payment to him by sale and delivery, the goods being and remaining unpaid for by the customer, and the object of the present bill being to reclaim and recover them by the complainants on their original title as undivested by reason of the frauds practiced in obtaining and misapplying them, the discretion of the chancellor in refusing an injunction and the appointment of a receiver as means of securing the forthcoming of the goods or their proceeds, will not be controlled where the ability of the favored creditor (in whose possession the goods are) to respond to any decree likely to be rendered against him upon the bill, is, though not certain, reasonably probable—no less probable, apparently, than the right of the complainants to have a decree against him.

Injunction and receiver. Evidence. Argument. Practice in the Superior Court. Sales. Fraudulent conveyance. Before Judge LAWSON. Bibb County. At Chambers. January 29, 1879.

Early & Lane and others filed a creditors' bill against Oliver & Norton and Douglass, making, in brief, the following case:

On October 25, 1877, there was in existence in the city of Macon a firm doing business under the name of Oliver, Douglass & Co. Owing to a general belief in the solvency of Douglass, this partnership had fair credit, and stood well with the business community. On the day and year aforesaid this firm was dissolved by the withdrawal of Douglass, but the same business was continued by the other partners under the name of Oliver & Norton. Complainants having sold to the former firm, continued to supply their successors with such goods as they required in the general hardware business, which they conducted. During the year 1878, and especially in the months of September, October

and December, they sold to them goods amounting to nearly $12,000.00 a large portion of which still constitute a part of their stock. When the commercial paper given for such goods matured, said Oliver & Norton declined to pay the same, informed complainants that they had sold their entire stock to Douglass, that they had nothing and could pay nothing. Astonished at this proceeding, complainants sought for an explanation, but Oliver & Norton simply referred them to their counsel, and the latter declined to give them any information. They then went to the records of Bibb county and there found a mortgage covering said stock of goods, dated November 20, 1878, recorded the 18th day of the following month, purporting to be to secure the said Douglass in the payment of two notes, each for $8,135.72, one due at thirty and the other at sixty days from date. On the day of its record said O. & N. made a bill of sale of said stock to said Douglass in full satisfaction of the mortgage. This mortgage and bill of sale complainants insist are void for the following reasons:

1. At the date of the bill of sale there was nothing due on the mortgage.

2. On November 20, 1878, said stock of goods was only worth $15,000.00. The mortgage could not cover a larger amount than was present at the time of its execution. When the bill of sale was made, goods to the amount of $20,000.00, or other large sum, had been added by the fraudulent purchases of O. & N., to swell said stock for the benefit of Douglass, of all of which he was fully cognizant, participating in the fraud.

3. The indebtedness to Douglass, if any existed, was subsisting before the fraudulent purchases aforesaid. Douglass had an intimate knowledge of the business of the firm —was the brother-in-law of Norton, and participated in the fraud perpetrated, attempting to collect the amount of his pretended indebtedness out of the goods of complainants, under the forms of law. O. & N. never intended to pay for said goods when they purchased; they then had in view

the fraud which they are now attempting to execute, and Douglass procured the mortgage and bill of sale for the purpose of appropriating the property of complainants to his own use.

Most of complainants do business at a considerable distance from the city of Macon, and in selling goods to the above named firm, were necessarily compelled to rely upon the integrity of the members thereof. To inform themselves of their financial standing they called upon O. & N. for statements of the condition of their business from time to time, and their replies showed such business to be thoroughly solvent. (The statements are set out in the bill and are utterly inconsistent with the facts subsequently developed.) If they were indebted to Douglass in the large sum now claimed when those replies were made, the statements then forwarded were thoroughly false and fraudulent. If they were not indebted to Douglass, then he is endeavoring by a thin and patent fraud to take the property of complainants for his own benefit, or for the benefit of O. & N., or of both jointly.

Complainants, before selling to O. & N., applied to Douglass for information as to their financial standing, and he sedulously sought to produce the impression that the firm was solvent and worthy of credit. (The bill then specifies an instance.)

For each of complainants to take out legal process, whether by attachment for the purchase money, or attachment against O. & N. as fraudulent debtors, would lead to a great number of separate suits. To bring simply common law actions would be useless, as O. & N. have no property subject to the payment of their debts, save said stock of goods. Therefore the equitable powers of the court are indispensable.

They therefore pray that defendants be enjoined from further interfering with said goods, that the bill of sale to Douglass be set aside as fraudulent and void, and that a receiver be appointed to take charge of said stock and to

sell the same as directed by the chancellor.   Discovery was waived.

By an amendment, complainants presented the following facts:

By reason of the misrepresentations, fraud, etc., charged in the bill, the title to the said goods did not pass to O. & N., but remained in complainants.

Complainants charge, as an additional badge of fraud, that since said pretended sale, Douglass, by his agents, has been offering said stock for sale at prices below the market value.

They further charge that Douglass is of doubtful solvency, if not actually insolvent.   Besides a tax upon a stock of merchandise in Savannah, he pays tax upon only $8,000.00 of real estate, upon which there is a mortgage to a Loan Association to secure an advance of $5,000.00.   There are three other mortgages upon such realty in favor of his son, amounts now unknown.   From information derived from one of the defendants, unless Douglass succeeds in paying the debt of O. & N. to him with complainants' goods, his financial condition will be exceedingly precarious and his insolvency inevitable.   He returns merchandise for taxation in Savannah only $5,000.00, and furniture $300.00. In Bibb county he only returns $14,000.00 in real estate, upon which there is a mortgage made August 11, 1877, to secure a note due twelve months after date, for $5,600.00, with ten per cent. interest.   He would be wholly unable to pay complainants' debts should it be so decreed.   They pray that the sales by them to O. & N. be rescinded, and the goods so bought turned over to the receiver.

The answers of the defendants denied every material allegation in the bill.   Douglass alleged that at the time of the sale to him of the stock of goods, O. & N. were *bona fide* indebted to him in the sum of $18,200.00, which was more than the value of the property conveyed to him in satisfaction thereof.   He asserted that they had the right to prefer him ; he denied that he had ever made any rep-

resentations to any of complainants as to the solvency of
O. & N., and gave his version of the conversation had with
the agent of one of the complainants referred to in the
bill.

In an affidavit subsequently made, he stated that he was
worth in real estate located in Savannah and Macon, $28,-
000.00 ; in stock of goods and other personalty located in
Savannah, $10,000.00, and that he did not owe exceeding
$5,000.00. He therefore insisted that he was solvent, and
amply able to respond to any decree that might be rendered
against him.

Numerous affidavits *pro* and *con* were introduced, some
in reference to the value of the stock at the time of the
mortgage, at the time of the sale, etc., in reference to mu-
tilation of books by defendants, a mysterious entry on the
account of Douglass with O. & N. to his credit, as follows :
"Services to October 27, $10,427.25," whilst complain-
ants claimed he had never rendered any such services.
Other testimony consisting of accounts, letters, statements,
etc., were introduced, all of which is deemed immaterial
here.

Two affidavits were offered by complainants in which the
affiants testified purely upon the information of others.
These the chancellor regarded as hearsay and refused to
consider.

The application for injunction was heard at Macon, in the
county of Bibb, before Judge Lawson, of the Ocmulgee
circuit, Judge Simmons, of the Macon circuit, being provi-
dentially absent from the state.

When the evidence closed, it was then a few minutes
past nine o'clock P. M., on Saturday evening, and complain-
ants suggested to the chancellor that it would be better to
adjourn until Monday, but on his expressing a desire to
finish so as to return to Eatonton on the seven o'clock train
in the morning, they proposed to divide the time equally
with the defendants until midnight, as in their view it would
be illegal to go on beyond that hour. Defendants' counsel

stated that he would not consume more than one hour and a half in his argument. Counsel for complainants had occupied forty minutes of the time when counsel for defendants began his argument. When he had proceeded for one hour and a half, his attention was called to the agreement, and the chancellor requested to enforce the same. To this the counsel objected, and the chancellor ruled that he had no authority to limit the argument. Counsel for defendants continued until twelve minutes of the hour of twelve, thus leaving to complainants for a concluding argument only about twelve minutes. After the argument, the chancellor carried the papers to Eatonton, in the county of Putnam, and at the latter place passed an order refusing the injunction and the appointment of a receiver. He directed that this order be entered on the minutes of Bibb superior court. To this order complainants excepted, and assign error as follows:

1. That the chancellor erred in refusing to consider the affidavits hereinbefore referred to, on the ground that they were based on hearsay.

2. That he erred in refusing said injunction and the appointment of a receiver under the circumstances, and in the manner stated.

3. That he erred in refusing to adjourn the hearing of the application from Saturday night until Monday, in order to allow complainants more time for argument.

HILL & HARRIS; THOS. WILLINGHAM, JR.; C. L. BARTLETT; R. K. HINES; BLOUNT & HARDEMAN; NISBETS & PIERCE; W. A. POE, for plaintiffs in error, cited Code, §§2634, 2635, 3173, 3174; Kerr on F. & M., 108, 110; 9 G. & J., 220; 2 La., 81; 8 Cal., 207; 2 Mass., 236; 12 Pick., 307; 19 Mo., 36; 24 N. Y., 139; 3 Whart,, 369; 42 *Ga.*, 46; 58 *Ib.*, 50; 62 *Ib.*, 157; Code, §§1952, 1953; 53 N. Y., 462; 1 Paige, 492; 2 *Ib.*, 169.

LANIER & ANDERSON, for defendants, cited Kerr on F. & M., 108, 109, note; 20 Mo., 546; 42 *Ga.*, 46, 124; 58 *Ib.*,

50; 2 Woods, 215; 1 Wall., 330; 1 Paige, 305, 491; 9 Wend., 548; 23 *Ib.*, 370; 3 Kern., 161; 1 S. & M., 45; 5 Ill., 387; 8 Fla., 405; 53 N. Y., 462; 4 Cow., 717; 2 Dev. & B., 360.

BLECKLEY, Justice.

1. Why should hearsay as to ordinary matters of fact be evidence on applications for interlocutory remedies, such as injunction and the appointment of a·receiver, when such testimony would, under the rules of law, have to be rejected at the final hearing of the cause, and could therefore have no influence on the ultimate result? And of what use would be the reception, by the chancellor, of affidavits to which he should not look in making up his judgment? They would be useless lumber, and only swell the volume of papers in the case. In the affidavits rejected, the affiants deposed to nothing of the least materiality, upon their own knowledge; their statements rested on information derived from others.

2. Ample opportunity for full argument is certainly an important right to the parties, and if denied on the main trial of a case, civil or criminal, the denial would furnish sufficient reason, generally, for a new trial. 49 *Ga.*, 255; 55 *Ib.*, 466; 60 *Ib.*, 367. In that stage of litigation, even when the merits are clearly against the losing party, he should have such mental satisfaction as he could derive from having finished his speech. He should not be slaughtered with his address warm in his bosom, alive and undelivered. His case being finally and forever lost, with his argument unheard, he would feel perhaps, and sometimes justly feel, that the outrage of deciding without hearing him was greater, far greater, than the calamity of the adverse decision itself. He might get justice, but with it a wound from the court more painful than any justice which the court could administer; for it is not impossible that a suppressed speech may occasion more mental torture than a lost case.

The anguish of having something to say and wanting to say it, of feeling that you have a right to say it, and of being cut off by a peremptory exercise of authority, is, no doubt, intense. Even a child will chafe under it, however inured to the habit of obedience. A suitor accustomed to demand and receive all his rights, and to seeing the like rights of others usually respected, may well protest; and, of course, it is substantially the same to him whether he is silenced personally, or whether the silence is imposed upon his advocate or counsel. Courts are as much bound to abstain from violating rights of practice as rights of principle. The method ordained by law to reach justice is through a trial; and no final trial is full and complete under our system, without the argument of the parties or their counsel, or both, if they choose to exercise the privilege of discussion. So useful is the aid of argument in elucidating the real merits of a controversy and distinguishing the right side from the wrong, that for the sake of its business utility, aside from its bearing on the mental satisfaction of the parties, there is every reason for vindicating the privilege, as a mere privilege, in all final trials. Perhaps, too, the right itself may be hardly less perfect in interlocutory stages of the proceedings, whenever an order is to be made or judgment rendered. We need not now determine whether, in these minor and subordinate matters, it is subject to some discretion or not. In a perfectly clear case, it might possibly be incumbent upon the chancellor to indulge the doomed party and his counsel in "beating the air," and hear them as fully as if the interlocutory question under consideration were really debatable; but whether it is or not may be left open for the present. It is certain that the *result* itself of an application for an injunction and the appointment of a receiver, is largely a matter of discretion; whereas, generally, the result of final trial is, as far as practicable, governed by strict right. There is thus a wide difference between temporary and permanent defeat—between losing a mere step and faiilng to win the race. The

step of injunction and receiver before decree, is collateral rather than direct; it is an effort to collect together and secure the fruits of victory before completing the march and fighting the battle. The propriety of this advance raid into the enemy's camp under the safe conduct of the chancellor, by a near cut, is for his determination; and his discretion respecting it is broad and ample. He must, it is true, exercise his discretion wisely and not abuse it. Cases there are so clear that not to grant his assistance would be obvious error, and other cases so clear on the opposite side that to grant it would be equally erroneous. Though a high functionary, he is responsible to government, and where it is seen that he has mistaken his duty, he may be corrected. But in a doubtful instance, the result of the application must abide his discretion, and abide it to the end. This being so, when the result reached by him is satisfactory to the reviewing court, as well as to himself, must his discretionary order be reversed, and the interlocutory question be remanded, just to hear an undelivered or the conclusion of an unfinished argument? Suppose there were any number of errors in the means of reaching the decision, after the competent evidence offered was all admitted, and the incompetent all rejected, and that the refusal to adjourn over until Monday was one of them (and it may have been, though we will not say that it was), are we to nullify a sound discretionary order, and a negative one at that, not to correct *it*, but to correct the improper denial of a motion to adjourn? The argument which the inopportune arrival of Sunday cut short below, has at least, we may believe, been produced before us in all its proportions; and though it was both able and extended, we cannot think that it would or should have been followed by a different judgment if the chancellor had heard every word of it. We are sure, if he had heard it and had stood out against it, we would not have forced him to yield; then, shall we oblige him or some other judge to listen to it by way of experiment to verify its actual effect on a

judicial mind other than our own ? Shall we not rather, as it fails to convince us, assume that, though excellent and forcible, it is inherently unconvincing in the face of the evidence in the record ?

3. The judge of the Ocmulgee circuit, in the absence of the judge of the Macon circuit, attended at Macon, where the cause was pending, and heard the evidence, and also the argument so far as he could hear it without encroaching upon the Sabbath or remaining over till a succeeding day. He then returned to his home in his own circuit, and there made up his judgment, reduced it to writing, and sent it to the clerk for record. The law fixes no particular place for these extraordinary remedies in chancery to be acted upon. The whole proceeding might have been had in the Ocmulgee circuit. The judge could, if he had pleased, have declined to meet the parties and their counsel at Macon, and could have held his sitting from beginning to end at Eatonton, or elsewhere in his own circuit. He was acting at chambers, and might open his chambers where it suited him—certainly at any place within either of the two circuits. By opening at Macon, he did not commit himself, irrevocably, to .that location of his official chambers for every part of his action on this case. He might have heard a part of the evidence there, and for good reason, a part elsewhere ; or all the evidence there, and the argument elsewhere ; and so, we-think, it was allowable for him to hear both the evidence and the argument there, and make his judgment at Eatonton. If he had been so disposed, we can see no reason why his judgment might not have been matured and written out in the woods; at least, the writer of this opinion cannot. And when it was ready for the eyes of the parties and the world, all he had to do was to contrive that it should reach the hands of the clerk to be duly recorded. It spoke for itself, and there was no occasion for his presence to promulgate or announce it.

4. We have already indicated that we are satisfied with the decision. True it is, perhaps, that the evidence makes a

probable case of fraud, and that the complainants may have an ultimate right to relief; but it makes an equally probable case of solvency on the part of the defendant Douglass. If the facts alleged in the bill on the element of fraud are true, and shall be established at the final hearing, a decree requiring Douglass to disgorge will ensue; and, taking all the evidence into consideration, it seems as probable that such a decree will find him with sufficient fortune to meet it, as that it will be rendered. There is a reasonable probability of his solvency; and the remedy by injunction and receiver, if it should turn out that he did not participate in the fraud of his co-defendants, nor have notice of the same, though he has profited thereby, would prove harsh to him in the extreme. He may be honest, but, if he is not, his apparent solvency is, for the present, average security to these complainants. If appearances grow worse, the application, now refused, may be renewed in the light of any new developments, and then be granted; or if not then available, and no other effective remedy can be found, this will not be a very uncommon experience to those who have done a credit business "since the war." The law cannot prevent injustice in every instance. Would that it could.

Judgment affirmed.